1

2

3

4

5

6

7                      IN THE UNITED STATES DISTRICT COURT

8                        FOR THE DISTRICT OF OREGON

9                           PORTLAND DIVISION

10

11  **ZAINAB HUSSEIN ABED,**

12          Plaintiff,                    Case No. CV 09-160-HU

13      v.
                                          **OPINION AND**
14  **MICHAEL J. ASTRUE,** Commissioner   **ORDER**
    of Social Security,
15
            Defendant.
16

17

    Richard Sly
18  1001 S.W. Fifth Avenue, Suite 310
    Portland, Oregon 97204
19
    Linda Ziskin
20  P.O. Box 2237
    Lake Oswego, Oregon 97035
21      Attorneys for plaintiff

22  Dwight Holton
    Acting United States Attorney
23  District of Oregon
    Adrian L. Brown
24  Assistant United States Attorney
    1000 S.W. Third Avenue, Suite 600
25  Portland, Oregon 97204
    Kathryn A. Miller
26  Special Assistant United States Attorney
    Social Security Administration
27

28  Opinion and Order Page 1

701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
        Attorneys for defendant

HUBEL, Magistrate Judge:

Zainab Abed brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act.

## Procedural Background

Ms. Abed filed an application for benefits on July 29, 2004, with an alleged onset date of January 1, 1993. The application was denied initially and on reconsideration. Ms. Abed requested a hearing, which was held before Administrative Law Judge (ALJ) Catherine Lazuran. On December 28, 2007, the ALJ issued a decision finding Ms. Abed not disabled.

Ms. Abed sought review by the Appeals Council. On January 6, 2009, the Appeals Council denied review. This made the ALJ's decision the final decision of the Commissioner.

Ms. Abed was born in 1960, and was 47 years old at the time of the ALJ's decision. She immigrated to the United States from Iraq in 1999. She has no work history in this country. According to the hearing testimony of her husband, Ms. Abed has a college degree in sports and Arabic and taught girls in middle and high school in Iraq. She last worked in 1998. She has some understanding of English, but does not speak it. She alleges disability on the basis

Opinion and Order Page 2

of possible schizophrenia, depression with psychotic features, Post Traumatic Stress Disorder (PTSD), migraine headaches, fibromyalgia, diabetes, and hypothyroidism.

### Medical Evidence

Since March 29, 2002, Ms. Abed has been treated by several doctors in the Providence Medical Group: Dorina Boboia, M.D., Victorya Khary, M.D., Vien Luu, M.D., Terry Olson, M.D., and Linh Dao, M.D., for complaints of pain in her arms and legs, swelling and stiffness in her joints, and headaches. Tr. 179. Lab tests did not indicate a condition that would account for the pain, swelling and stiffness. Tr. 176. For her first few visits, Ms. Abed was accompanied by her husband, who translated for her. Tr. 177. Ms. Abed and her husband attributed the pain to events in 1996, when they escaped from Iraq and lived in the mountains for several months during a cold winter. Tr. 177.

Dr. Khary found no swelling, redness or tenderness of the joints upon examination. Id. Dr. Khary noted that the etiology of the leg pain was unclear, but that it "[c]ertainly could have been from damage due to her situation in Iraq." Tr. 178. Dr. Khary suggested extra strength Tylenol and prescribed Vicodin as needed for break-through pain. Id.

On December 3, 2002, Dr. Luu prescribed salsalate, a non-steroidal anti-inflammatory drug, and gabapentin (Neurontin) for pain. Tr. 176. On December 12, 2002, Dr. Olson found diffuse mild non-localized pain on palpation of her back and both legs, but no sciatic notch pain, effusion or swelling of knees or hips, and no

Opinion and Order Page 3

pain on passive range of movement or with active exertion. Neurological examination was normal. Tr. 174. Because Ms. Abed complained of pain in the arches of both feet, Dr. Olson diagnosed myofascial pain with plantar fascitis. Tr. 175. He prescribed Effexor, an antidepressant. Id.

On January 7, 2003, Ms. Abed began complaining of nausea and an episode of vomiting. Tr. 173. On January 14, 2003, Dr. Olson recorded complaints of diffuse pain, mostly in Ms. Abed's calves. Tr. 171. She complained of swelling, but Dr. Olson saw no visible edema. Id. Dr. Olson wrote that her symptoms had not responded to NSAIDs, antidepressants, Tylenol or tincture of thyme. Dr. Olson wrote, "Exam has been and remains underwhelming. Labs normal and reviewed again." Id. Dr. Olson's diagnostic impression was "fibromyalgia type pain." Id.

When Ms. Abed saw Dr. Olson on February 26, 2003, she came with a translator, as her husband had been called up with the military. Tr. 163. Ms. Abed said she had been taking an average of 15 ibuprofen a day for pain. Id. She was no longer taking Effexor, as it did not seem to help. Id. She was tearful, and Dr. Olson noted that she had "many social stressors and language is a barrier." Id. Dr. Olson diagnosed depression and anemia due to chronic blood loss from menstruation. Id.

On March 27, 2003, Dr. Dao noted complaints of pain and swelling in her arms and legs, fatigue, and Tr. 167. She had been taking amitriptyline and trisalate, but they did not help her pain. Id. Dr. Dao noted, "[P]ain in extremities of unclear etiology.

Thought it was fibromyalgia but could have peripheral neuropathy, polymyalgia rheumatica, depression." Id. He discontinued the amitriptyline and trisalate and started her on antidepressants, despite the previous ineffective trial of Effexor, and suggested cyclobenzaprine for fibromyalgia. Tr. 168.

Ms. Abed saw Dr. Khary on April 29, 2003, and told her that previously-prescribed Fluoxetine and Flexeril did not help her pain. Tr. 165. She was started on trazodone for insomnia and continued on the Fluoxetine. Id.

On June 2, 2003, Ms. Abed told Dr. Khary she was sleeping better on the fluoxetine and trazodone, and that the swelling in her legs was improved, though she continued to have pain in them. Tr. 163. She said she was feeling nauseated and dizzy, with daily headaches and difficulty concentrating. Id.

On January 29, 2004, Ms. Abed presented at the Providence St. Vincent ER. Tr. 258. She complained of fever, muscle aches, mild sore throat and pain on urination and over her bilateral flanks. Tr. 258. She was diagnosed with acute febrile illness and discharged on Tylenol and fluids. On February 6, 2004, Ms. Abed reported this incident to Dr. Khary. Tr. 157. Dr. Khary opined that Ms. Abed's muscle pain was "complicated by depression [and] sedentary lifestyle." Tr. 158.

On March 19, 2004, Ms. Abed reported that she had felt dizzy and fallen down, possibly losing consciousness, at the Sunset Transit Center. Tr. 153. She said she had a hard time concentrating and sometimes became nauseated with the dizziness. Id. She also

Opinion and Order Page 5

complained of intermittent pain in her left arm, chest and throat whenever she walked, as well as heart palpitations. Id. A treadmill test on March 20, 2004 was unremarkable. Tr. 250. On April 12, 2004, Dr. Khary noted that a CT of the head and an adenosine thallium test had been negative. Tr. 151.

On May 6, 2004, Dr. Khary wrote that Ms. Abed had seen war violence in Iraq, including having witnessed the death of her brother. Tr. 148. Her husband was in Iraq and she was living with her 15 year old daughter and 13 year old son. She had been told that to get welfare, she had to take English classes, but did not feel that she could do it. Id. She said she had fallen down at Thriftway, in an episode similar to that at the Sunset Transit center a month earlier. Ms. Abed cried during the office visit. She was on Prozac. Id. Dr. Khary thought her primary diagnosis was depression, and wrote that she would look into counseling for Ms. Abed. Tr. 150.

On July 22, 2004, Dr. Khary noted that Ms. Abed had seen a neurologist, Dr. Syna, who had started her on Neurontin and Buspar. Tr. 146. Ms. Abed reported that the medication made her headaches less frequent, but they were still intense. Ms. Abed asked for an increase in her Prozac dose. Id

On August 19, 2004, Ms. Abed was diagnosed with diabetes mellitis, type 2, controlled without medication. Tr. 144. For insomnia, she was given Ativan. Tr. 145. On September 13, 2004, Ms. Abed said the Ativan helped her sleep, and that the Neurontin helped her headaches, but was not covered by her insurance. Tr.

Opinion and Order Page 6

1  142.

2  On November 29, 2004, Dr. Khary noted that Ms. Abed's blood

3  sugars had been high, and they discussed her going on glucophage.

4  Tr. 137. Ms. Abed continued to complain of dizziness and headaches.

5  Id.

6  On December 3, 2004, Ms. Abed was given a comprehensive

7  psychodiagnostic examination by John Givi, Ph.D. Tr. 122. Dr. Givi

8  wrote that Ms. Abed communicated through an interpreter; as the

9  sole source of information, she appeared to be a poor historian,

10  and gave conflicting responses to questions. Id.

11  She reported having diabetes and hypercholesterolemia, as well

12  as headaches, insomnia and pain. She said she had been diagnosed

13  with depression in Iraq, but denied past and present suicidal

14  ideation and denied having had counseling. Tr. 123. When asked to

15  describe a typical day, she was vague, stating only that she had

16  breakfast at 9 a.m., went to bed at 1 a.m., and stayed in her room

17  for the rest of the day. Id.  She reported her activities of daily

18  living (ADLs) as taking one shower a week, being able to dress

19  herself, use a phone, and cook every three days, as well as walk to

20  the grocery store twice a month, clean her apartment, and do her

21  laundry once a month. Tr. 123. She cannot drive. Id. She received

22  some financial assistance from welfare. Tr. 124.

23  Her cognitive ability was estimated to have been in the

24  average range, based on her educational history. Tr. 124. Word

25  recognition skills, some mental status factors, and ability to

26  communicate were hindered by her inability to speak English. Id.

27

28  Opinion and Order Page 7

However, Ms. Abed did not appear to experience difficulty communicating through the Arabic speaking interpreter, although she seemed "less than willing to be forthright." In Dr. Givi's opinion, she seemed to exaggerate her difficulties, noting "this could be a cry for help but also a secondary gain should be legitimately considered." Id. Attention span could not be evaluated because of the language barrier. Tr. 125. She described her mood as depressed, which was congruent with her thought process. Id. Ms. Abed's thought content seemed to center "on issues related to 'my future.'" She acknowledged being afraid of losing her children and reported that she was experiencing auditory hallucinations. Id. There was no psychotic thought process evident. Id. Dr. Givi concluded that Ms. Abed met the diagnostic criteria for Major Depressive Disorder, Recurrent, Mild. Tr. 126.

On December 10, 2004, Robert Henry, Ph.D. did a records review on behalf of the Commissioner. Tr. 130, 279-81. Dr. Henry opined that Ms. Abed was moderately limited in her ability to maintain activities of daily living and social functioning; complete a normal workday; interact appropriately with the general public; maintain concentration, persistence or pace; and set realistic goals or make plans independently of others. Id.

On May 11, 2005, Ms. Abed was seen for mental health treatment at Lifeworks Northwest, on referral from Dr. Khary. Tr. 304. She was accompanied by her daughter Shahed, who acted as an interpreter. Ms. Abed was seen by Cynthia Martin, M.S., supervised by Ken Ihli, Ph.D. Ms. Abed endorsed symptoms of depression,

Opinion and Order Page 8

including sadness, feelings of guilt and worthlessness, irritation, anger, difficulty concentrating, and sleeping, memory problems, constant worry, dizziness, increased appetite, and headaches. Id. She said that when she became "angry," her heart raced and she felt as though she was suffocating. She denied suicidal or homicidal ideation. She worried about finances and was angry at her husband for leaving the family to return to Iraq. She had nightmares, and during the day heard constant talking by voices that were trying to distract or confuse her. She said these experiences began when her brother was killed. She also described fleeing Iraq and living in refugee camps. She said she experienced intrusive thoughts of these images. Id.

Toward the end of the interview, Ms. Abed became noticeably tired, irritable, and impatient to leave. She spoke only Arabic, so communication was complicated, and it was difficult for the examiner to determine level of thought coherence, organization, or intactness of memory. Id.

On May 11, 2005, Ms. Abed reported to Ms. Martin that she continued to experience dizziness, headaches and body pain, as well as difficulty sleeping because of bad dreams. Tr. 303. Ms. Abed said she was unable to leave home because "something inside" was controlling her, and "the voices confuse me." Id. At her next appointment, on May 19, 2005, Ms. Abed refused to answer any questions, saying it didn't help to talk. Tr. 302. Ms. Abed's daughter said she had made her mother come to the appointment, but the session ended early when Ms. Abed said she wanted to leave. Id.

Opinion and Order Page 9

On May 26, 2005, Ms. Abed initially refused to speak. Tr. 301. After Ms. Martin asked Ms. Abed's permission to speak to her daughter, Shahed said her mother did not speak to her either, and that the voices made it "so that she cannot attend to others." Id. While the conversation with Shahed was going on, Ms. Abed said she was concerned about the fire alarms, as they spied on her and she was afraid of them. She said she heard voices all the time, and that she wanted them to stop. During the session, Ms. Abed was observed at several points to begin to talk to something only seen by her, laughing a few times. Id. Dr. Ihli consulted with a psychiatrist, Howard Rosenbaum, M.D., who recommended that Ms. Abed be started on Paxil or Zoloft. Id.

On May 27, 2005, Dr. Luu saw Ms. Abed, noting, "depressed ... poor eye contact, quiet." He started her on Lexapro. Id.[1]

On June 1, 2005, Ms. Martin wrote a chart note stating that based on the symptoms Martin had observed, Ms. Abed appeared to meet the criteria for Psychotic Disorder Not Otherwise Specified. Tr. 300. On June 2, 2005, Ms. Abed accused Ms. Martin of trying to spy on her and refused to speak. Tr. 299. Shahed stated that her mother did not want to come and did not think talking about her problems would help. Shahed reported that Ms. Abed's doctor had prescribed Zoloft, and that they were going to the doctor the next day for a recheck. Shahed stated that her mother would not want to see a male doctor. During this time, Ms. Abed continued to speak to

---

[1] Ms. Abed has been prescribed numerous drugs at different times. The record does not provide a clear picture of her medications over time.

Opinion and Order Page 10

the voices and at times interrupted Shahed to warn her not to speak to the therapist. Id.

On June 3, 2005, Dr. Luu wrote, "depression, hallucinations, possible schizophrenia vs. psychoaffective disorder. Patient is not able to take any test for her US citizenship..." Tr. 326.

On June 14, 2005, Ms. Abed saw Dr. Luu. Tr. 324. Dr. Luu assessed depression with psychosis after speaking to Cynthia Martin, and added Risperdal to her drug regimen. Id.

On June 14, 2005, Ms. Martin's chart notes stated that Ms. Abed's primary care doctor had called and requested that Ms. Abed be seen by a psychiatrist at Lifeworks. Tr. 298. On June 29, 2005, Shahed left a message at Lifeworks cancelling Ms. Abed's appointment, and reporting that her mother was no better. Id. On July 6, 2005, Ms. Abed was terminated from treatment. Tr. 296. Ms. Martin wrote that although Ms. Abed continued to experience auditory hallucinations, anxiety, fear, paranoia, and depression, she was not able to engage in treatment. Id.

On September 8, 2005, Ms. Abed was seen by Dr. Rosenbaum. Tr. 295. She was accompanied by her husband. Id. She was mute throughout the interview, with her husband answering all questions. Id. When her husband mentioned the death of Ms. Abed's brother, she stood up and wanted to leave. Otherwise, she sat quietly, although she appeared to be listening closely to what was being said. Id.

Ms. Abed's husband explained that he had been in Iraq working with the U.S. Army as an interpreter during the past two and a half years, having returned to the United States two months earlier. Id.

Opinion and Order Page 11

He confirmed that Ms. Abed's brother had been killed in 1991, and that their family had fled to the Kurdish region, pursued by security police. Id. He said he was arrested and spent two years in prison, but was released after the intervention of the United Nations and International Red Cross. Id. They crossed the border to Syria in 1998. From there the family was granted asylum in the United States. Id.

Ms. Abed's husband reported that she talked to herself in a nonsensical language and did not talk to anyone else. Id. She usually sat alone in her bedroom. According to Ms. Abed's husband, her current medications were Metformin, Imitrex, Zoloft, thyroid medication, amitriptyline to sleep, Lovastin, Oxybutynin and Risperdal. Id.

Dr. Rosenbaum did not have sufficient time to assess Ms. Abed's psychiatric problems, but concluded that "[t]he patient is painting a picture of tremendous trauma. ... It may be difficult to refer the patient for psychotherapy given language limitations." Tr. 295.

On November 3, 2005, Dr. Rosenbaum saw Ms. Abed with her husband, after trying her on Zyprexa and Zoloft. Tr. 292. Her husband said he had not noted any significant change on the medication. Id. He said she spent the day sitting around the house either on the couch or in bed, inactive and withdrawn. Id. She was not reading or watching TV, but sometimes talked to herself. Id. She did not initiate conversation, but would answer yes or no to his questions. Id. Ms. Abed answered a few of Dr. Rosenbaum's

Opinion and Order Page 12

questions. Id. She repeatedly stated that "they are listening to us." Id. She said people talk to her and she doesn't like it, wanting them to leave her alone. Id. Her 16 year old son and 17 year old daughter helped with cooking and cleaning. Id.

Dr. Rosenbaum concluded that Ms. Abed "continues to be psychotic and withdrawn on Zyprexa and Zoloft." He recommended continuing the medications at a higher dose; if she did not respond, other drugs would be tried. Id.

On December 6, 2005, Ms. Abed saw Dr. Khary with her husband, who interpreted for her. Tr. 316. He said his wife had been depressed since her brother was killed, but recently her depression was worse and that she had hallucinations. He felt the medication was not helping her. Id. She was not speaking to him or to the children. Id. Dr. Khary observed that Ms. Abed was withdrawn and did not make eye contact or speak to Dr. Khary when asked questions. Tr. 317. She said a few words to her husband, but nothing else. Dr. Khary noted, "Quite a marked change from last time I saw her last year when she was conversing and even laughing." Id.

On April 19, 2006, Dr. Khary observed that Ms. Abed was "very withdrawn, not very talkative." Tr. 314. Her daughter was cooking for her and helping her eat. Id. Ms. Abed "just sits all day and stares into space," as well as hearing voices. Id.

On April 24, 2006, Dr. Rosenbaum saw Ms. Abed with her daughter. Tr. 290. Ms. Abed's daughter had not noticed any significant change for the past few months, and said she had

Opinion and Order Page 13

observed her mother in this condition for three or four years, since their father left for Iraq. Id. She believed her mother continued to hear voices, and often observed her talking to herself. Id. Dr. Rosenbaum noted that Ms. Abed continued to be "depressed, withdrawn, apparent psychotic features of auditory hallucinations." Id. He recommended a trial of Cymbalta, but also thought the family should consider a trial of electroconvulsive therapy (ECT), "given working diagnosis of psychotic depression and lack of response to medications." Id. He referred them to Kevin Smith, M.D., for an ECT consult. Tr. 291.

On July 12, 2006, Dr. Khary noted that Ms. Abed was withdrawn. Tr. 311. Ms. Abed's daughter related that she was seeing a psychiatrist "but no consistent followup."[2] Id. The daughter felt her mother would do better with a female psychiatrist. Ms. Abed's daughter said they had moved to a new apartment, and that Ms. Abed seemed happier there. Ms. Abed's husband was now back with the family. Id. Dr. Khary recommended that the family follow up with a new female psychiatrist "to get a fresh opinion." Tr. 313. Dr. Khary gave her several names and telephone numbers. Id.

On July 18, 2006, Dr. Khary filled out a Work & Activity Release. Tr. 306. She checked a box titled, "No Work or Activity Release at this Time," on the basis of auditory hallucinations, severe depression and anxiety, and fibromyalgia. She noted that prognosis was poor, and that disability was expected to last longer

---

[2] Dr. Rosenbaum's notes indicate that he advised Ms. Abed to make follow up appointments every two to four months. Tr. 284, 291.

than one year. <u>Id.</u> Under "Comments," Dr. Khary wrote:

> Ms. Abed has been evaluated by Dr. Howard Rosenbaum, psychiatrist, and received counseling by Cynthia Martin, MS at Lifeworks. ... Dr. Rosenbaum [said] that she has what appears to be psychotic symptoms and possible schizophrenia.

<u>Id.</u>

On July 18, 2006, Dr. Rosenbaum wrote that Ms. Abed's daughter reported no significant change with the Cymbalta. Tr. 288. Ms. Abed continued to sit around the house, without interest in any activities, staring throughout most of the day. <u>Id.</u> Her daughter believed her mother was hallucinating because she talked to herself. <u>Id.</u> Dr. Rosenbaum told Ms. Abed and her daughter that ECT was probably the treatment of choice. Dr. Rosenbaum set up a consultation with Dr. Smith. <u>Id.</u> He increased the Cymbalta and switched from Zyprexa to Geodon. Tr. 289.

On August 19, 2005, Dr. Luu saw Ms. Abed for dizziness. Tr. 320. Dr. Luu wrote that Ms. Abed refused to talk, and that her daughter reported that the Risperdal had not made any difference. <u>Id.</u>

On November 20, 2006, Dr. Rosenbaum wrote that Ms. Abed's daughter reported that her mother was doing better. Tr. 286. She had not been talking to herself, was more interactive with her children, and was not secluding herself as much. However, Ms. Abed's daughter said her mother never showed much interest in anything. <u>Id.</u>

///

///

Opinion and Order Page 15

Dr. Rosenbaum thought Ms. Abed was showing "gradual, slow improvement" on the combination of Zyprexa and Cymbalta. He decided to gradually increase the Cymbalta dose, while continuing the Zyprexa. Id. He again reviewed the benefits of ECT, but Ms. Abed's daughter said she did not believe her mother would agree to the treatment, and that her father was also against it. Tr. 287.

In a letter dated January 18, 2007, Dr. Rosenbaum stated that he was treating Ms. Abed for major depressive disorder, severe, with psychotic features, and for PTSD. Tr. 308. He said:

> The severity of her depression with psychotic symptoms prevents her from learning English and/or US History and Civics. Symptoms of her disease include poor ability to focus, ... concentrate, and loss of reality testing. On a mental status examination she often will not respond to questions because of extreme withdrawal. Because of her poor reality testing she would not have an ability to understand the importance of learning English and American History in order to qualify for citizenship. In addition, even if she understood the importance, because of her inability to focus and concentrate and respond appropriately, I do not believe she would be able to learn. Another aspect of her depression is her lack of interest and ability to engage with another person appropriately in an interpersonal relationship. ...

Id.

On February 8, 2007, Dr. Rosenbaum wrote that when asked how she was feeling, Ms. Abed responded, "I am good." Tr. 284. Upon more questions, she got "slightly irritated," and said, "Quit asking questions, I am good." Id. Her daughter reported steady, but slow improvement, with her mother being more engaged and less irritable, and apparently not hallucinating. Dr. Rosenbaum continued the current regimen of Cymbalta, 120 mg. and Zyprexa, 30 mg.

///

Opinion and Order Page 16

1

**Hearing Testimony**

2    Ms. Abed testified at the hearing, on June 6, 2007, through an

3    interpreter. When the ALJ asked for Ms. Abed's full name, the

4    interpreter answered, "I don't get a response. She is afraid to

5    answer." Tr. 385. When the ALJ cautioned Ms. Abed that if she did

6    not answer questions, she could not expect to obtain benefits, Ms.

7    Abed responded with her first name. Id. When the interpreter asked

8    her to say her whole name, she answered, "Why are you bothering

9    me?" and "I want to go home. I don't want to sit here." Id. After

10   Ms. Abed's attorney asked her to answer the questions, she said she

11   was 40 years old and born in Iraq. Tr. 386.

12   Ms. Abed also testified that her husband did not work; that

13   she was unable to drive; that she did not speak English; and that

14   she "used to teach students a long time ago." Tr. 389-90. However,

15   when asked when she last taught, she responded, "As you wish," and

16   "I'm tired. I don't know," and "I want to go. I want to leave." Tr.

17   389-90. She continued to repeat similar statements, tr. 391, as

18   well as asking the ALJ why she kept asking questions when "I didn't

19   do anything to you." Tr. 389, 391, 392, 393. Her attorney put his

20   own observation on the record that "during the period of time that

21   Ms. Abed has been in here, much of it has been spent using her

22   right hand in a circular motion across the top of the table." Tr.

23   391. Although some additional information was obtained, such as

24   testimony that sometimes she had pain in every part of her body,

25   Ms. Abed continued to repeat that she wanted to go home "and stay

26   there," was tired and had a headache, had "nothing to do with

27

28   Opinion and Order Page 17

anybody anymore," and did not want to answer questions. Tr. 392, 393. She insisted to the ALJ and her attorney, "Why do you speak with me? I haven't done anything to you," "I have nothing to do with you," and "I am not going to talk to you." Tr. 392-97. At one point she told the ALJ, "I would like to stay at home and have rest, and I don't want anything," tr. 394, and told her attorney, "You shut up, I go home." Tr. 392.

Ms. Abed's husband, Jawdat Mohammad, testified that their children were 18 and 17, and that he and his wife had been married 21 years. Tr. 398-99. Ms. Abed had a college degree in sports and Arabic language, both of which she taught in Iraq. Tr. 399. She last taught in 1996 or 1997. Id. She has lived in the United States since July 2004; her husband was with the United States military in Iraq from 2003 to 2005. Tr. 400. During the time he was gone, she was receiving welfare and food stamps, but was not receiving money from him. Tr. 401. She was in charge of the household while he was gone. Tr. 403. He is unable to work because of "medical issues," and has also applied for Social Security benefits. Tr. 402. The family continues to get welfare and food stamps, as well as public housing. Tr. 403. He testified that during an average day, his wife does "nothing": he or the children cook, wash dishes, and shop for groceries. Tr. 405. Ms. Abed has no friends, has not traveled since July 2004, does not read and does not have any hobbies. Tr. 406. She sleeps "too much." Id. Ms. Abed's husband thought her main problem was "three or four big shocks in her life," that she was unable to deal with. These included her 17 year old brother's

Opinion and Order Page 18

abduction by the secret police, with his body being left a few days later at their home; the imprisonment of her husband; and witnessing the accidental death by fire of one of her students. Tr. 407-09.

The ALJ called a vocational expert (VE), Gail Young. Tr. 410. The ALJ asked the VE to evaluate Ms. Abed's work history; the VE characterized it as skilled light work. Tr. 411. The VE thought she was hypothetically able to work as a teacher's aide. Tr. 411.

The ALJ asked the VE to consider a person of Ms. Abed's vocational background, with no exertional limitations, and able to do at least simple repetitive tasks involving occasional contact with the public. Tr. 412. The VE opined that such a person could not do Ms. Abed's previous work, but that she could do assembly production and housekeeping/cleaning work. Tr. 412. The attorney asked the VE if a person with the symptoms described by Dr. Rosenbaum in his letter of January 18, 2007 would be able to maintain competitive employment; the VE responded that she could not. Tr. 413.

**ALJ's Decision**

The ALJ found that Ms. Abed had not engaged in substantial gainful activity since July 29, 2004, and that her depressive disorder and diabetes were severe impairments. Tr. 15. The ALJ found that Ms. Abed did not have an impairment or combination of impairments that met or medically equaled the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the List of Impairments). ///

Opinion and Order Page 19

The ALJ found the testimony of Jawdat Mohammed not fully credible because he testified at the hearing that Ms. Abed needed help with everything at home, while Ms. Abed had told Dr. Givi in December 2004 that she was cooking, doing housework, walking to the grocery store, and doing laundry, and because there was evidence in the record that she had taken public transportation alone.[3] The ALJ also cited to the report of Dr. Givi, in which he noted forms in the file and indications in her treating physician's notes that Ms. Abed was able to care for her children, do household chores, shop and take care of finances. Tr. 19. The ALJ also took note of Dr. Givi's statement that Ms. Abed seemed to be exaggerating her difficulties, perhaps for secondary gain, and of his concern about whether she was putting forth her best efforts. Id.

The ALJ rejected Dr. Rosenbaum's opinion that Ms. Abed had a depressive disorder with psychotic features and PTSD, and that she would not be able to learn English or American history in order to qualify for citizenship. The ALJ noted, "The implication is that she is disabled." Tr. 21. The ALJ rejected Dr. Rosenbaum's opinions because he had said in February 2007 that Ms. Abed seemed to be improving, and because Ms. Abed was going on errands with her daughter. Tr. 21.

The ALJ found further that it did "not appear Dr. Rosenbaum even did mental status examinations of the claimant but has relied mostly on subjective reports by the claimant and family members."

---

[3] The ALJ cited tr. 135 as support for this finding, but the court has not found any reference on that page to Ms. Abed's taking public transportation alone.

Tr. 22. The ALJ found "more objective and useful information" from Dr. Givi's evaluation and from Dr. Givi's comment about exaggeration by Ms. Abed and "the possibility that secondary gain was involved in her allegations." <u>Id.</u>

The ALJ rejected Dr. Khary's opinion in July 2006 that Ms. Abed was unable to work because Dr. Khary's treatment records were "vague and refer to normal mental status in January 2005," and because Dr. Khary's disability opinion "seems to be based on the claimant's subjective claims or those of the claimant's family." Tr. 21. The ALJ also found "minimal objective findings by other doctors who have seen the claimant," but the portions of the record cited in support of these findings are documents of lab tests ordered by Dr. Khary, tr. 309, 310, chart notes made by Dr. Khary herself, and chart notes by Susan Payne, M.D., a surgeon who performed retrocele repair and perineoplasty on Ms. Abed in February 2005. Tr. 335. The ALJ also found Dr. Khary's notations of "healthy appearing, no distress" inconsistent with Dr. Khary's statement about disability. Tr. 21.

The ALJ found Ms. Abed not credible because a third party report made by her friend, Michael Bishop, in August 2004 "describes the claimant's activities as being more extensive than the claimant described at the same time." Tr. 21, citing tr. 77-83, 70-74. The ALJ did not give specific examples of discrepancies, but concluded, "This indicates that the claimant has not been honest concerning her activities of daily living." Tr. 21.

///

Opinion and Order Page 21

The ALJ found the testimony of Ms. Abed's husband "not fully credible" because there was "contrary evidence that, before and since he has been back in the U.S., claimant has been more functional than he has described." Tr. 19. The ALJ again cited Mr. Bishop's report and reports reviewed by Dr. Givi in December 2004 that she was cooking, doing housework, walking to the grocery store, and doing laundry. Tr. 19.[4]

The ALJ found that Ms. Abed was mildly restricted in activities of daily living, based on Mr. Bishop's 2004 report that she took care of her children, prepared meals, cleaned, took care of one fish and one bird, did yard work and laundry, and paid bills. Tr. 16. With respect to social functioning, the ALJ found that Ms. Abed had moderate difficulties, in that she spent most of her time at home and went out only for basic necessities, and then not alone. Id. The ALJ found that Ms. Abed was mildly limited with regard to concentration, persistence or pace, based on her ability to work as a teacher in Iraq in 1997 or 1998, and on tests administered by Dr. Givi revealing that she had average intelligence and remote memory functions. Id. The ALJ acknowledged that her short term memory fell into the impaired range. Id. ///

---

[4] Ms. Abed has not challenged the ALJ's finding that her husband's testimony in 2007 was not "fully credible," nor the ALJ's failure to make any findings with respect to the many occasions on which Ms. Abed's daughter described her symptoms to doctors. The ALJ rejected the husband's testimony in its entirety, because it differed, in unspecified ways, from descriptions provided by Mr. Bishop and by Ms. Abed to Dr. Givi in 2004.

On the basis of these findings, the ALJ concluded that Ms. Abed had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, with limitations of simple, repetitive tasks involving occasional contact with the public. The ALJ did not make a finding on whether Ms. Abed's inability to speak, read or write English affected her RFC.

The ALJ concluded that Ms. Abed was not disabled, relying on the VE's testimony in response to her hypothetical that Ms. Abed was able to perform such jobs as assembly worker and housekeeper. Tr. 23.

### Standard

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are,

Opinion and Order Page 24

> therefore, not disabled. We will not consider your age,
> education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe
impairment or combination of impairments, the disability claim is
denied. If the impairment is severe, the evaluation proceeds to the
third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the
impairment meets or equals "one of a number of listed impairments
that the [Commissioner] acknowledges are so severe as to preclude
substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a
claimant's impairment meets or equals one of the listed
impairments, he is considered disabled without consideration of her
age, education or work experience. 20 C.F.R. s 404.1520(d),
416.920(d).

If the impairment is considered severe, but does not meet or
equal a listed impairment, the Commissioner considers, at step
four, whether the claimant can still perform "past relevant work."
20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he
is not considered disabled. Yuckert, 482 U.S. at 141-42. If the
claimant shows an inability to perform his past work, the burden
shifts to the Commissioner to show, in step five, that the claimant
has the RFC to do other work in consideration of the claimant's
age, education and past work experience. Yuckert, 482 U.S. at 141-
42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

///

///

Opinion and Order Page 25

**Discussion**

Ms. Abed asserts that the Commissioner erred in 1) improperly rejecting the opinions of treating physicians Khary and Rosenbaum; 2) making legally inadequate severity findings at step two of the sequential evaluation process by failing to consider any impairments except depression and diabetes; 3) failing to evaluate all of Ms. Abed's impairments; and 4) posing an incomplete hypothetical to the VE, thereby rendering the VE's testimony insufficient to support a finding of non-disability.

**Rejection of the opinions of Doctors Khary and Rosenbaum**

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine, but do not treat; and 3) those who neither examine nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan, 246 F.3d at 1202; Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan 246 F.3d at 1202, 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over those of nonspecialists. Id.; 20 C.F.R. § 404.1527(d)(5).

Under the regulations, if a treating physician's medical opinion is supported by medically acceptable diagnostic techniques

Opinion and Order Page 26

and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Holohan, 246 F.3d at 1202; 20 C.F.R. § 404.1527(d)(2). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. Id. at 1202, citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. Id. An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides "specific and legitimate" reasons supported by substantial evidence in the record. Id. Similarly, an ALJ may reject a treating physician's uncontradicted opinion on the ultimate issue of disability only with "clear and convincing" reasons supported by substantial evidence in the record. Id. If the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. Id.

If a treating physician's opinion is not given "controlling weight" because it is not "well supported" or because it is inconsistent with other substantial evidence in the record, the ALJ is to consider specified factors in determining the weight it will be given. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). These

factors include the length of the treatment relationship and the frequency of examination by the treating physician and the nature and extent of the treatment relationship between the patient and the treating physician. Id., citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; and the specialty of the physician providing the opinion. Orn at 631, citing 20 C.F.R. § 404.1527(d)(3)-(6).

A finding that a treating medical source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Orn, 495 F.3d at 631-32. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. Id.

### 1.  Dr. Rosenbaum

Dr. Rosenbaum is a treating psychiatrist. His diagnosis of depressive disorder with psychotic features is consistent with that of Ms. Martin and Dr. Ihli,[5] and with Dr. Luu's diagnosis of

---

[5] In Benton ex rel. Benton v. Barnhart, 331 F.3d 1030 (9th Cir. 2003) the court held that a supervising psychiatrist could be considered a treating source where the psychiatrist oversaw a

depression with psychosis; Ms. Martin, Dr. Ihli and Dr. Luu are all, like Dr. Rosenbaum, treating sources. The only contradictory opinion is that of Dr. Givi, who saw Ms. Abed before the others, and who examined her on one occasion, December 3, 2004.[6] Even Dr. Givi found Ms. Abed to have Major Depressive Disorder, Recurrent, Mild. The ALJ rejected all of the treating source opinions in favor of the opinions of Dr. Givi.

The ALJ's stated reasons for rejecting the opinions of Dr. Rosenbaum were that Dr. Rosenbaum referred to improvement in Ms. Abed's condition on February 8, 2007, tr. 284, and because it did not appear that Dr. Rosenbaum did mental status examinations, relying instead on "subjective reports by the claimant and family members." These reasons are not sufficient to support rejection of Dr. Rosenbaum's opinions.

The chart note referring to improvement in February 2007, in its entirety, states: "Daughter notes steady but slow improvement. She describes her mother being more engaged, talking more. She has not been hallucinating. She seems less irritable. ... She does note that her mother has been more comfortable when they go out to run errands. Is able to tolerate several hours in the community." Tr. 284. The sentence does not say that Dr. Rosenbaum found Ms. Abed improved on that occasion, but that her *daughter* had observed some

---

team of therapists.

    [6] The records review done by Robert Henry, Ph.D., was done in December 2004, before Dr. Rosenbaum began treatment; therefore Dr. Henry's opinions cannot be considered to contradict those of Dr. Rosenbaum.

Opinion and Order Page 29

1  recent improvement. The same chart note states that Dr. Rosenbaum
2  has decided to "continue this current combination given the gradual
3  improvement," and "[p]urpose of medication is to treat ongoing
4  symptoms of depression and PTSD." Id. A slow, gradual improvement
5  from the situation Dr. Rosenbaum found Ms. Abed in from May 2005 to
6  February 2007 does not support the rejection of Dr. Rosenbaum's or
7  any other treatment provider's opinion.

8      A physician's statements must be read in context of the
9  overall diagnostic picture he draws. Holohan, 246 F.3d at 1205. Dr.
10  Rosenbaum's decision to continue Ms. Abed on the same medication
11  regimen in order to treat her "ongoing" symptoms of depression and
12  PTSD do not indicate that he found her improved, no longer in need
13  of treatment, nor able to work. The ALJ's citation to an isolated
14  reference to improvement, in the context of the entire record, does
15  not constitute a specific and legitimate reason for rejecting Dr.
16  Rosenbaum's opinions.

17     The ALJ's finding that Dr. Rosenbaum did not do mental status
18  examinations is erroneous. The chart notes show otherwise. See,
19  e.g., tr. 294 (paragraph captioned "Mental Status Exam," with
20  notation that patient was alert, would not answer questions, sat
21  quietly in chair, did not respond to any questions, appeared to be
22  listening, mumbled a few unintelligible words); tr. 292 ("The
23  patient continues to be psychotic and withdrawn. ... Seems slightly
24  more verbal today in session."); tr. 290 ("depressed, withdrawn,
25  apparent psychotic features of auditory hallucinations"); tr. 284
26  ("When asked how she is feeling, she replies, 'I am good.' Denies

27

28  Opinion and Order Page 30

any problem with sleep and appetite. As I continued to ask questions, she gets slightly irritated...")[7] These are all notations of Ms. Abed's mental status.

Where a disability claimant's condition is deteriorating, the most recent medical report is most probative. Young v. Heckler, 803 F.2d 963 (9th Cir. 1986). Dr. Givi's report is the oldest psychological report in the record.

I conclude that the ALJ's rejection of Dr. Rosenbaum's opinions in favor of those of Dr. Givi was legally erroneous and unsupported by substantial evidence in the record as a whole.

**2.  Dr. Khary**

The ALJ rejected Dr. Khary's opinion in July 2006 that Ms. Abed was unable to work. The ALJ's stated reasons were that Dr. Khary's treatment records were vague, referred to normal mental status in January 2005, were based on the claims of Ms. Abed or her family, and because Dr. Khary's notations of "healthy appearing, no

---

[7] The record contains numerous similar mental status assessments from Ms. Abed's other physicians and from psychologists. Dr. Luu wrote on May 27, 2005 that Ms. Abed was "depressed," made poor eye contact, and was quiet. Dr. Khary observed on December 6, 2005 that Ms. Abed was "withdrawn," did not make eye contact, or speak to Dr. Khary when asked questions, and showed "quite a marked change from last time I saw her last year when she was conversing and even laughing," tr. 316; "very withdrawn" on April 19, 2006, tr. 314; "withdrawn" on July 12, 2006, tr. 311. Cynthia Martin's observations were that Ms. Abed "refused to speak" on July 6, 2005, tr. 297; thought the therapist was "spying on her," "continued to speak to the voices and at times interrupted Shahed to warn her not to speak to the therapist as she was spying," on June 2, 2005, tr. 299; talked to "something only seen by her," "continued to inspect the room for outlets that might enable them to listen to her," on May 26, 2005, tr. 301; and refused to speak on May 19, 2005, tr. 302.

Opinion and Order Page 31

distress" were inconsistent with disability.

The ALJ did not specify which parts of Dr. Khary's treatment records were "vague;" this finding therefore does not meet the requirement that reasons given for rejecting the opinions of treating physicians be specific. Dr. Khary's reference to "normal mental status" does not, in context, suggest that Dr. Khary found nothing wrong with Ms. Abed. See, e.g., tr. 311 ("[p]atient does not talk a lot, just a few words, withdrawn"); 314 ("very withdrawn, not very talkative"); 315 ("sits in a chair, says a few words to daughter at times, not very responsive to questions"); tr. 317 ("patient withdrawn in office, does not make eye contact, does not speak to me when I ask her questions").

The ALJ's rejection of Dr. Khary's opinions because they were based on the reports of family members is erroneous. Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account, Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). In fact, an ALJ's failure to comment on competent lay testimony requires reversal unless the court can "confidently conclude" that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination. Stout v. Commissioner, 454 F.3d 1050, 1056 (9th Cir. 2006) The ALJ gave no reasons why Dr. Khary should have disregarded the "subjective" reports of Ms. Abed's daughter and husband about Ms. Abed's history and her symptoms. It is difficult to imagine what those reasons could be in view of Ms. Abed's inability to speak English and her refusals to answer questions. The ALJ's reasons for

rejecting the opinions of Dr. Khary are legally erroneous and unsupported by substantial evidence in the record.

### Absence of severity findings

The medical evidence contains diagnoses of psychosis, PTSD, hypothyroidism, anemia, and diabetes.[8] The ALJ made no findings at step two of the sequential analysis about the severity of these medically determinable impairments. An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on individual's ability to work, and the adjudicator must consider the combined effect of all impairments. Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). Step two is a "de minimis screening device used to dispose of groundless claims," id., and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when her conclusion is "clearly established by medical evidence." Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005). The ALJ's failure to make any severity findings at all about the effect of these impairments, either singly or in combination with the impairments found to be severe, was legal error.

///

///

---

[8] Although Ms. Abed challenges the ALJ's failure to make severity findings on her fibromyalgia and schizophrenia as well, I find no evidence in the record that fibromyalgia and schizophrenia were actually diagnosed, as opposed to being considered. I therefore find no error in the ALJ's finding that fibromyalgia was not a medically determinable impairment.

Opinion and Order Page 33

**Hypothetical to VE**

The ALJ must propose a hypothetical to the VE that is based on medical assumptions supported by substantial evidence in the record that reflects each of the claimant's limitations. <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163 (9th Cir. 2001). An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence. <u>Id.</u> at 1165. If the claimant fails to present evidence that she suffers from certain limitations, the ALJ need not include those alleged impairments in the hypothetical question to the VE. <u>Id.</u> at 1164.

If the hypothetical posed to the VE by the ALJ does not reflect all of disability claimant's limitations, the VE's testimony has no evidentiary value to support a finding that the claimant can perform jobs in national economy. <u>Matthews v.Shalala</u>, 10 F.3d 678 (9th Cir. 1993). Thus, the VE's testimony is competent only when the hypothetical accurately portrays the claimant's individual physical and mental impairments. <u>Irwin v. Shalala</u>, 840 F. Supp. 751 (D. Or. 1993).

The ALJ's hypothetical to the VE was limited to considering a person with the RFC to do at least simple repetitive tasks involving occasional contact with the public. Not included in the hypothetical to the VE were the limitations described by Dr. Rosenbaum: severe depression, psychotic symptoms such as hallucinations, poor ability to focus or concentrate, loss of reality testing, extreme withdrawal, lack of interest and ability to engage with another in an interpersonal situation, and inability

Opinion and Order Page 34

1  to learn. Nor did the ALJ consider the effect of pain on Ms. Abed's
2  RFC, although Dr. Khary recorded on several occasions that she
3  thought Ms. Abed's pain was a symptom of her depression. When Ms.
4  Abed's attorney questioned the VE about the limitations identified
5  by Dr. Rosenbaum, she responded that such a person would not be
6  capable of maintaining competitive employment.

7      The ALJ's rejection of Dr. Rosenbaum's opinions was legally
8  erroneous and unsupported by substantial evidence in the record.
9  Ms. Abed has medically determinable limitations for which the ALJ
10 failed to make any severity finding. Some of her medically
11 determinable limitations were not included in the hypothetical to
12 the VE, making the VE's testimony insufficient to support the ALJ's
13 finding of non-disability. Indeed, the VE testified that Ms. Abed
14 could not maintain employment with the symptoms Dr. Rosenbaum
15 described.

16                              **Remand**

17     Sentence four of 42 U.S.C. § 405(g) gives the court discretion
18 to decide whether to remand for further proceedings or for an award
19 of benefits. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).

20     In Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996), the
21 court held that improperly rejected evidence should be credited and
22 an immediate award of benefits be made when: 1) the ALJ has failed
23 to provide legally sufficient reasons for rejecting such evidence,
24 2) there are no outstanding issues that must be resolved before a
25 determination of disability can be made, and 3) it is clear from
26 the record that the ALJ would be required to find the claimant

27

28 Opinion and Order Page 35

disabled were such evidence credited.

I conclude that the <u>Smolen</u> test is satisfied here, that Dr. Rosenbaum's testimony should be credited, and benefits should be awarded.

**Conclusion**

The Commissioner's decision is REVERSED and REMANDED for award of benefits.

IT IS SO ORDERED.

Dated this 24th day of <u>August</u>, 2010.


                                    <u>    /s/Dennis James Hubel    </u>

                                    Dennis James Hubel
                                    United States Magistrate Judge

OPINION AND ORDER Page 36